UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| JAMES TRICKEY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 1:09CV26 SNLJ |
| ) | |
| KAMAN INDUSTRIAL TECHNOLOGIES ) | |
| CORP., et al. ) | |
| ) | |
| Defendants. ) | |

# MEMORANDUM AND ORDER

A jury found in favor of plaintiff after a five-day trial in this employment discrimination case under the Missouri Human Rights Act, Section 213.010 RSMo *et seq*. ("MHRA"). The jury awarded plaintiff $160,000 for his claim of age discrimination, $100,000 for his claim of retaliation, and $500,000 in punitive damages against plaintiff's former employer, defendant Kaman Industrial Technologies Corp. ("Kaman").

Defendant Kaman filed its Renewed Motion for Judgment as a Matter of Law, for a New Trial, or to Reduce or Remit Damages on September 29, 2011 (#167). Responsive memoranda have been filed, and this matter is now ripe for disposition.

**I.     Background**

A thorough recitation of the facts of this case may be found in this Court's Order denying summary judgment to Kaman (#96). A somewhat abbreviated version of those facts and the facts brought out at trial follow.[1]

---

[1] Neither party cites to or quotes from the trial transcript, which made the Court's recitation of facts developed at trial difficult.

Plaintiff was employed by Kaman as Branch Manager for the Cape Girardeau, Missouri branch. He reported directly to Tom Caputo, who was a District Manager for Kaman. Caputo hired plaintiff in May 2000, when Caputo was 52 years old and plaintiff was 57. After years of good performance reviews and marked improvements in the Cape Girardeau branch sales, sometime in 2007, plaintiff's relationship with Kaman began to deteriorate. Plaintiff testified that defendant Caputo told him, first while playing golf in the summer and again at a meeting later that year, that "the average age of management at Kaman was 59 years old." Plaintiff also says that Caputo followed up those statements with comments about the company's need to get some "new blood." Plaintiff testified that he took that to mean that Kaman was looking for new, younger employees. Caputo denied making those statements.

Plaintiff's December 2007 Performance Review was poor, and Caputo designed and implemented a Performance Improvement Plan ("PIP") for plaintiff. Plaintiff's PIP required him to, among other things, (1) hold a meeting with the branch team by December 10, (2) hold weekly progress review meetings, (3) submit a 2008 business plan by January 4, and (4) submit personal weekly plans and report to Caputo each Friday. Plaintiff was also instructed to attend training on computer and management skills by the end of the first quarter of 2008. Plaintiff signed the PIP, indicating "that if I do not meet these expectations over the next 90 days, further disciplinary action may result, up to an including termination."

On January 2, 2008, plaintiff mailed a written rebuttal to his 2007 Performance Review to Laura Reeves and Kaman's president. The rebuttal addressed Caputo's criticism that, among other things, plaintiff spent too much time inside the office rather than generating new business. In his rebuttal, plaintiff explained that because the branch was short-handed, he had often worked in the office to support inside sales. Plaintiff requested authority to hire more

employees, and Caputo himself recognized the "urgent need to hire an inside salesperson to support the robust growth in Cape Girardeau," but his requests went unanswered with no explanation.  Furthermore, his attempts to seek the training required by his PIP also went unanswered.  No one at Kaman responded to his January 2 rebuttal letter.

Plaintiff had a phone call with Kaman Vice President Robert Goff on January 19, 2011 and alleged that he was being discriminated against because of his age. In that conversation, which plaintiff recorded, Goff suggested that plaintiff retire, but plaintiff said "I don't really want to.  I've got a good branch.  We're doing very well.  We're number five in the company." Goff responded that the "branch is doing exceptionally well."

On January 26, 2008, plaintiff filed a charge of age discrimination and retaliation with the Missouri Commission on Human Rights.  Whether plaintiff achieved all of the PIP objectives by the prescribed deadlines is disputed, but plaintiff was demoted to Professional Accounts Manager ("PAM") on February 4, 2008.

Plaintiff's relationships with his coworkers had become strained (although the parties agree that plaintiff's relationship with some employees had been strained for years), so plaintiff began working as a PAM from home.  He was assigned accounts and expected to build sales, but he was not allowed to pursue accounts that he had previously worked on that were sure to be fruitful.  He emailed Caputo requesting accounts that had been previously assigned to an employee who recently left, but Caputo did not respond to plaintiff's email or assign the accounts to plaintiff.  Caputo also consented in a phone conversation and by email to plaintiff's working from home, despite telling plaintiff that he needed to work from his office computer and not his home computer.  Human Resources director and Vice President Robert Goff was not aware that plaintiff had permission to work from home.

3

Ken Higgins, who had been subordinate to plaintiff but by this time had assumed some duties of Branch Manager, including finishing the 2008 business plan for the branch, covertly observed plaintiff at his home and reported back to Caputo that plaintiff was not working because he had been seen landscaping his yard. (Plaintiff explained that he took a break from work to help his wife in the yard, but defendants dispute that.) Defendants then hired a private investigator to report on plaintiff's activities. Goff testified in his deposition that, by that point, "It seemed a futile situation. But we were hopeful that perhaps some additional information of poor performance or bad behavior would add to our case." Goff further said that Kaman had considered terminating plaintiff in February, when plaintiff was demoted instead.

During the private investigator's and Higgins's surveillance, plaintiff was using the company truck and trailer over the weekend for personal use. Although plaintiff admits to using the truck, he denies the company's accusation that he wrongfully established an account in Kaman's name at a retailer in order to avoid state sales tax. Finally, the private investigator reported that plaintiff was running personal errands or staying in his home on each of three mornings of surveillance. Kaman interpreted this as a failure to perform his job adequately. Plaintiff points out, however, that Goff did not know that he was permitted to work from home. Furthermore, plaintiff disputes that he was not performing his job, as he says he was making sales calls by telephone and otherwise working out of his home office. In addition, plaintiff notes that the investigator observed plaintiff only in the morning and never after 1:00 p.m.

On May 8, 2008, Goff put plaintiff on indefinite, unpaid suspension pending his decision to accept severance pay and retire. Plaintiff remained on unpaid suspension until mediation efforts in this litigation failed. Plaintiff sought compensation for defendant's alleged discrimination based on age and retaliation in violation of the MHRA, § 213.010, *et seq.* RSMo.

4

Plaintiff filed this lawsuit in the Circuit Court of Cape Girardeau County on February 6, 2009, alleging that Kaman, Caputo, and Higgins had violated the MHRA by discriminating against plaintiff based on his age and by retaliating against plaintiff for his discrimination complaint.  Kaman removed the case to this Court based on diversity jurisdiction, *see* 28 U.S.C. § 1332, and the Court subsequently dismissed Higgins as a defendant because Higgins — who was not an "employer" within the meaning of the MHRA — could not be sued under the MHRA (#14).  Plaintiff voluntarily dismissed defendant Caputo before trial.  After a five-day trial, the jury awarded plaintiff $160,000 for his claim of age discrimination, $100,000 for his claim of retaliation, and $500,000 in punitive damages for the retaliation claim against Kaman.

## II.     Legal Standards

### A.     Judgment as a matter of law

Defendant Kaman's motion for judgment as a matter of law faces a high hurdle, as "[a] jury verdict is entitled to extreme deference." *Craig Outdoor Advertising, Inc. v. Viacom Outdoor, Inc.*, 528 F.3d 1001, 1009 (8th Cir. 2008) (citing *Morse v. S. Union Co.*, 174 F.3d 917, 922 (8th Cir.), *cert. dismissed*, 527 U.S. 1059 (1999)).  The Court may not set the jury verdict aside "unless no reasonable jury could have reached the same verdict based on the evidence submitted." *Craig*, 528 F.3d at 1009 (citing *Ryther v. KARE 11*, 108 F.3d 832, 836 (8th Cir.), *cert. denied*, 521 U.S. 1119 (1997)).

In conducting its review, the Court considers the evidence "in the light most favorable to the jury verdict." *Craig*, 528 F.3d at 1009.  Specifically, the Court must "assume all conflicts in the evidence were resolved in [plaintiff's] favor, assume plaintiff proved all facts that his evidence tended to prove, and give plaintiff the benefit of all favorable inferences that reasonably may be drawn from the proven facts." *Morse*, 174 F.3d at 922.

5

### B.     New trial

The district court may grant a new trial when the first trial resulted in a miscarriage of justice, through a verdict against the weight of the evidence, an excessive damage award, or legal errors at trial. *Gray v. Bucknell*, 86 F.3d 1472, 1480 (8th Cir. 1996); *see also* Fed. R. Civ. P. 59(a). With respect to legal errors, a "miscarriage of justice" does not result whenever there are inaccuracies or errors at trial; instead, the party seeking a new trial must demonstrate that there was prejudicial error. *Buchholz v. Rockwell International Corp.*, 120 F.3d 146, 148 (8th Cir. 1997). Errors in evidentiary rulings are prejudicial only where the error likely affected the jury's verdict. *Diesel Machinery, Inc. v. B.R. Lee Industries, Inc.*, 418 F.3d 820, 833 (8th Cir. 2005).

### C.     Remittitur

The Court may grant remittitur when "the jury's verdict is excessive because the amount of the verdict exceeds fair and reasonable compensation for plaintiff's injuries and damages." Mo. Rev. Stat. § 537.068; *see also EEOC v. HBE Corp.*, 135 F.3d 543, 557 (8th Cir. 1998) (citing Missouri's remittitur statute).

## III.    Discussion

Each of defendant Kaman's arguments is addressed below.

### A.     Plaintiff's discrimination and retaliation claims

Kaman contends that it is entitled to judgment as a matter of law because, it argues, plaintiff failed to make a submissible case on his discrimination and retaliation claims. In the alterative, Kaman argues that it is entitled to a new trial because the jury's findings of liability and damages are manifestly against the weight of the evidence.

To establish liability for age discrimination under the MHRA, a plaintiff must demonstrate that age was a "contributing factor" in an employment decision. *Daugherty v. City*

*of Maryland Heights*, 231 S.W.3d 814, 820 (Mo. 2007). A "contributing factor" is "one that contributed a share in anything or has a part in producing the effect." *EEOC v. Con-Way Freight, Inc.*, 622 F.3d 933,938 (8th Cir. 2010) (citation omitted).  To establish liability for retaliation under the MHRA, a plaintiff must establish that he "engaged in protected activity" and, as a direct result, suffered damages "due to an act of reprisal."  *Richey v. City of Independence*, 540 F.3d 779,783 (8th Cir. 2008) (citation omitted).  The plaintiff must show that retaliation was a "contributing factor" in the adverse employment decision.  *Hill v. Ford Motor Co.*, 277 S.W.3d 659, 664-65, 668 (Mo. 2009).

     Kaman contends that plaintiff relied primarily on Caputo's statements about Kaman's average age of management and the company's need for "new blood" to support his claims. Without more, Kaman argues, plaintiff's evidence is insufficient according to cases that held no discrimination had occurred despite supervisors' remarks regarding obtaining new, younger workers.  In support, Kaman cites primarily to *Kaplafka v. Hickman Mills Sch. Dist.*, No. 08-0933-CV-W-GAF, 2010 WL 2347510, **4, 9 (W.D. Mo. June 8, 2010) and *Hill v. St. Louis Univ.*, 923 F. Supp. 1199, 1215 (E.D. Mo. 1996).[2]  Kaman's authorities are distinguishable. In *Kaplafka*, the plaintiff testified that — although his supervisor had made comments about needing "new, young blood" to do plaintiff's job — plaintiff believed that he would have been discharged even if he had been younger than 40 years old.  2010 WL 2347510, at *4.  In *Hill*, the supervisor's "single stray remark" that there was a need for "fresh or new blood" did not, in and

---

[2]Kaman also cites, as "*see also*," *Wittenburg v. Am. Express Fin. Advisors, Inc*., 464 F.3d 831, 837 (8th Cir. 2006).  That case held that an employer's "general statement regarding the company's willingness to hire younger workers" did not establish the necessary causal relationship between the employer's statement and the plaintiff's termination.  Here, Caputo's alleged statements were not so general, as they were made in the context of Kaman's aging management.

7

of itself, suggest discrimination because it was made after plaintiff's termination and because nothing in context suggested age or sex discrimination.  923 F. Supp. at 1215.[3]

Here, although Kaman is quick to discount it, myriad other evidence supports plaintiff's claims.  Kaman discusses only plaintiff's assertions that he was "observed, demoted, or suspended around the time of his complaints, before 90 days had elapsed under his performance improvement plan."  But other facts supported plaintiff's claims as well:

- An e-mail written by Caputo asked for a salary increase for Ken Higgins — Kaman's successor manager in waiting who was in his mid-40s —  in order to retain Higgins until plaintiff's retirement, which Caputo expected within four years.

- Plaintiff was put on a performance improvement plan, or PIP, and was tasked with meeting certain objectives by certain deadlines.  While on that plan, evidence showed that Caputo undermined plaintiff's ability to reestablish his authority as branch manager by congratulating Higgins — not plaintiff — for the branch's excellent performance in an e-mail.

- When plaintiff — in an effort to meet his sales goals — asked for additional customer accounts, Caputo refused on the grounds that others had worked diligently on those accounts, so Caputo said he would not take the accounts away from others.  But Caputo admitted that there was no evidence other employees had worked diligently on the accounts he denied plaintiff.  Furthermore, just a

---

[3] Furthermore, as the Court already observed in its memorandum denying summary judgment to Kaman, "[p]laintiff counters that Missouri courts have never recognized the "stray remark doctrine," and defendants do not argue otherwise."  (#96.)

       month before plaintiff made his request, Caputo had transferred an account from Higgins to another Cape branch employee.

- Just two weeks after plaintiff complained about discrimination to Robert Goff, and only 58 days into the "90-day" PIP, Kaman demoted plaintiff to a sales position and gave him a gross sales target of $1.2 million. Kaman assigned plaintiff customer accounts for customers that had purchased only $200,000 total from Kaman the previous year.

- Plaintiff offered evidence that Kaman failed to meaningfully investigate his claims of discrimination and retaliation.

- Caputo admitted that, after plaintiff filed his charge of discrimination, Caputo began forwarding any negative remarks about plaintiff that were sent to him to executive management without verifying their truth or accuracy. Caputo testified that the truth or falsity of the damaging remarks were "irrelevant."

Moreover, although Kaman offered reasons for demoting and then suspending plaintiff, plaintiff put on evidence suggesting that those reasons were pretextual. For example, Kaman suggested at trial that it demoted plaintiff because employee complaints increased, but plaintiff countered that there had been no increase in complaints other than from Higgins, who actively and openly sought plaintiff's position. Kaman also suggested that plaintiff had alienated an important customer, but that customer denied it. Kaman claimed that plaintiff was not performing adequately as branch manager, yet plaintiff's branch performed very well in 2007 and into 2008. Finally, although Kaman states that plaintiff "missed nearly every deadline" set by his PIP, plaintiff offered evidence to show that he had done everything he could to comply with the PIP. Regardless, Missouri does not require that discrimination or retaliation be the only factor, or

9

even the determining factor, driving an adverse employment decision — rather, it need only be a "contributing factor," *Daugherty*, 231 S.W.3d at 819-820 — and the jury was not unreasonable in its finding for plaintiff.

In sum, there was sufficient evidence to support plaintiff's claim that plaintiff's age was a "contributing factor" in employment decisions affecting plaintiff. There was also evidence that Kaman wilfully disregarded plaintiff's rights in retaliation for plaintiff's complaint. As a result, Kaman cannot meet either the standard for a judgment notwithstanding the verdict or a new trial.

**B.     Punitive damages award**

To seek punitive damages, "the evidence and the inferences drawn therefrom" must be "sufficient to permit a reasonable juror to conclude that the plaintiff established with convincing clarity — that is, that it was highly probable — that the defendant's conduct was outrageous because of evil motive or reckless indifference." *Williams v. Trans States Airlines, Inc.*, 281 S.W.3d 854, 870 (Mo. Ct. App. 2009); *Brady v. Curators of the University of Missouri*, 213 S.W.3d 101, 109 (Mo. Ct. App. 2006). "An evil intent may also be implied from reckless disregard of another's rights and interests." *Williams*, 281 S.W.3d at 870. The same evidence used to establish the underlying discrimination or retaliation claim may be used to establish the submissibility of punitive damages. *Id.*

In addition to the evidence cited above, which supports that Kaman executives actively thwarted plaintiff's attempts to comply with the Performance Improvement Plan that Kaman put into place, plaintiff presented evidence that Goff based a disciplinary action (plaintiff's suspension) on information that the jury could reasonably conclude Goff knew to be false. Goff testified in his deposition that plaintiff was observed landscaping his yard throughout a workday by Ken Higgins, but Higgins testified that he drove by plaintiff's home only once, in the

morning. When challenged based on Higgins's testimony, Goff testified at trial that Linda Davis (another branch employee) had seen plaintiff landscaping that day — which was contrary to Goff's deposition testimony and not supported by Davis, who was also called by Kaman as a witness at trial.[4]

As noted above, the same evidence used to establish the underlying retaliation claim may be used to establish the submissibility of punitive damages. *Williams*, 281 S.W.3d at 870. Kaman's acts with respect to plaintiff's PIP — especially (1) that Kaman demoted plaintiff only days after he filed his grievance with the Missouri Human Rights Commission, (2) that Kaman suspended plaintiff after only 58 days of the 90 days he had been given, (3) that he had deliberately been set up to fail by a sales requirement that was practically impossible, and (4) that both before and after the demotion, Kaman refused to allow plaintiff to work on the only accounts that might have given him an outside chance to meet the sales requirements — were sufficient proof of Kaman's reckless disregard of plaintiff's right to file a grievance and therefore outrageous. Accordingly, the punitive damages claim was properly submitted to the jury.

Kaman also claims that the amount of the punitive damages award was excessive and in violation of Kaman's due process rights. The Due Process Clause of the Fourteenth Amendment prohibits the imposition of "grossly excessive" or "arbitrary" punishments. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003). "Elementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State

---

[4]Although plaintiff admitted that he had helped his wife with a discrete landscaping task on that day, plaintiff denied that he worked in his yard the entire working day.

11

may impose." *BMW N. Am., Inc. v. Gore*, 517 U.S. 559, 574 (1996). Awards of punitive damages are therefore judged by three guideposts: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *State Farm*, 538 U.S. at 418.

Under Missouri law, the Court may grant remittitur when "the jury's verdict is excessive because the amount of the verdict exceeds fair and reasonable compensation for plaintiff's injuries and damages." § 537.068 RSMo; *see also HBE Corp.*, 135 F.3d at 557 (citing Missouri's remittitur statute).   Missouri courts consider the following factors when considering punitive damages awards: (l) the degree of malice or outrageousness of the defendant's conduct; (2) the defendant's intelligence, standing, character, and financial status; (3) the plaintiffs age, sex, health, character, and financial status; (4) the injury suffered by the plaintiff; and (5) any aggravating or mitigating circumstances. *Collins v. Hertenstein*, 90 S.W.3d 87, 105 (Mo. Ct. App. 2002); *accord Call v. Heard*, 925 S.W.2d 840, 849-50 (Mo. 1996).

Kaman contends that its conduct toward plaintiff was not outrageous or malicious — but, as already discussed above, the jury was entitled to find that it was.  Further, Kaman argues that the United States Supreme Court has made clear that few awards "exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *State Farm*, 538 U.S. at 425; *Gore*, 517 U.S. at 582.  Kaman suggests that an approximate 1:1 ratio is appropriate under *State Farm* in light of the substantial actual damages plaintiff was awarded and the lack of any extraordinarily reprehensible conduct.  Kaman cites to two Eighth Circuit cases in which a 1:1 ratio has been applied: *Williams v. ConAgra Poultry Co.*, 378 F.3d

12

790, 795-96, 798-99 (8th Cir. 2004) (employment case); *Boerner v. Brown & Williamson Tobacco Co.*, 394 F.3d 594, 599, 601-03 (8th Cir. 2005) (tobacco case).  But in those cases, the Court remitted punitive damages awards that were *much* larger than the award at issue here. *Williams*, 378 F.3d at 799 (remitting $6 million award to $600,000); *Berner*, 394 F.3d at 603 (remitting $15 million award to $5 million).

Kaman argues that nothing about its intelligence or character warrants a $500,000 award, nor is there anything about plaintiff's personal characteristics justifies a $500,000 penalty. Kaman also cites to its "efforts to accommodate Plaintiff and other mitigating conduct."

Plaintiff counters that the punitive damages award *did* reflect only a single-digit multiplier.  The $500,000 award is less than two times the compensatory awards in the case — or less than four times the compensatory award if only the $160,000 age discrimination award is considered.  (Kaman asserts that the $100,000 award for plaintiff's claim of retaliation is an award for emotional distress and that those damages already contain a "punitive element," citing *State Farm*, 538 U.S. at 426; *accord Bach v. First Union Nat'l Bank*, 149 Fed. Appx. 354, 366 (6th Cir. 2005).)  Moreover, as the Eighth Circuit has observed, "the Supreme Court has repeatedly intimated that a four-to-one ratio is likely to survive any due process challenges given the historic use of double, treble, and quadruple damages as a punitive remedy."  *Wallace v. DTG Operations, Inc.*, 563 F.3d 357, 363 (8th Cir. 2009) (citing *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 23-24 (1991); *Gore*, 517 U.S. at 581 & n. 33).  Missouri courts have also upheld similar or larger awards in employment discrimination cases.  *See Brady v. The Curators of the Univ. of Missouri*, 213 S.W.3d 101 (Mo. Ct. App. 2006) (affirming a punitive award of $750,000.00 where plaintiff's actual damages totaled $300,000); *Lynn v. TNT Logistics North America, Inc.*, 275 S.W.3d 304 (Mo. Ct. App. 2008) (reversing trial court's remittitur of punitive

13

damages for plaintiffs sexual harassment claim from $6.75 million to $450,000, and instead remitting punitive damages $3.75 million, where compensatory damages were $50,000); *Howard v. City of Kansas City*, 332 S.W.3d 772 (Mo. 2011) (affirming punitive damages of $1.5 million and compensatory damages of $633,333).

The jury instruction in this case stated that, if the jury found in favor of plaintiff's retaliation claim, and if the jury believed Kaman's conduct "was outrageous because of Defendant Kaman's evil motive or reckless indifference to the rights of others, then...you may award Plaintiff James Trickey an additional amount as punitive damages in such sum as you believe will serve to punish Defendant Kaman and to deter Defendant Kaman and others from like conduct." Plaintiff submitted evidence sufficient to support the jury's determination that punitive damages were warranted, and the Court is satisfied that Kaman's due process rights were not violated. The multiplier in this case is not concerning, nor is it out of line with other employment discrimination cases in Missouri.

      C.      "Emotional distress" award

Kaman states that plaintiff's award for his retaliation claim was based solely on plaintiff's emotional distress. But the verdict forms — which had blanks only for "actual damages" —    did not ask the jury to distinguish between damages for emotional distress or others injuries. Kaman argues that plaintiff's counsel "directed the jury to award this amount for pain and suffering, to avoid duplicating the award of $160,000 on the age discrimination claim." Notably, Kaman does not cite to the transcript to support this statement, nor does plaintiff cite to the transcript to refute it.

Kaman argues that the evidence to support a $100,000 award for emotional distress is virtually nonexistent. Kaman points out that plaintiff did not have a medical or psychological

14

expert testify. Rather, plaintiff relied on the testimony of his wife, who stated that plaintiff was emotionally affected by his demotion and suspension without pay. That distress, Kaman argues, is "garden variety" distress that an ordinary person would feel under the circumstances and, as such, it does not justify a $100,000 award. Kaman asserts that amount was significantly higher than in other "garden variety" emotional distress cases. *See Van Den Berk v. Missouri Commission on Human Rights*, 26 S.W.3d 406, 413 (Mo. Ct. App. 2000) (awarding total damages, including emotional distress damages, of $8,000 to plaintiffs who made a claim for racial discrimination in housing); *Conway v. Missouri Comm'n of Human Rights*, 7 S.W.3d 571, 575 (Mo. Ct. App. 1999) (awarding $3,000 in emotional distress damages to plaintiff who made a claim for racial discrimination in the workplace); and *Missouri Comm'n on Human Rights v. Red Dragon Restaurant, Inc.*, 991 S.W.2d 161, 170 (Mo. Ct. App. 1999) (awarding $300 in damages for deprivation of civil rights to plaintiff who made a claim for disability discrimination in restaurant accommodations). Furthermore, Kaman argues, plaintiff's emotional distress may have been the result of the extended illness and then the death of plaintiff's son. But that argument cuts both ways because the jury could have found that Kaman's actions compounded plaintiff's already stressful situation.

Ultimately, it is not clear on what the jury based its award. To the extent the jury did award damages based on emotional distress, plaintiff certainly was not required to prove that he suffered medically diagnosable emotional distress in order to recover damages. *See Conway v. Missouri Comm'n on Human Rights*, 7 S.W.3d 571, 575 (Mo. Ct. App.1999). Indeed, as the Missouri Supreme Court has recognized, "damages for emotional distress of a generic kind...are generally in the common experience of jurors and do not depend on any expert evidence." *State ex rel. Dean v. Cunningham*, 182 S.W.3d 561, 568 (Mo. 2006). At the same time, Missouri law

15

allows the Court to grant remittitur when "the jury's verdict is excessive because the amount of the verdict exceeds fair and reasonable compensation for plaintiff's injuries and damages."  § 537.068 RSMo.  Here, however, even if the $100,000 retaliation award was based solely on emotional distress, the Court holds that remittitur is inappropriate.

> D. **Evidentiary rulings**

The Court permitted plaintiff's wife to testify as to what she heard another Kaman employee say.  The Court also permitted plaintiff to put on the testimony of Mark Kienstra as a rebuttal witness.  Kaman argues that it is entitled to a new trial based on those allegedly erroneous rulings.

> 1. **Double Hearsay Testimony**

Over Kaman's objection, plaintiff's wife was permitted to testify at trial about a conversation she purportedly overheard involving plaintiff and a Kaman branch manager named Ray Malhiwsky. Plaintiff's wife stated that she heard Malhiwsky tell plaintiff that he (Malhiwsky) heard Caputo say that the average age of management was 59 and Kaman needed some "new blood."  Kaman argues that this testimony constituted hearsay within hearsay under Federal Rule of Evidence 801(c), and that it was inadmissible under Federal Rule of Evidence 802.  At the outset, however, this Court determined that the testimony, even if erroneously admitted, was not prejudicial because it was cumulative.  Plaintiff already had testified that Caputo twice told him directly the same information.

In any event, the Court allowed the testimony to come in at trial because, under Rule 801(d)(2), "a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship" is not hearsay.  Caputo is undisputably Kaman's agent or servant, and the matter was within the scope of Caputo's

16

employment. Kaman's position is that Malhiwsky's statement was not within the scope of his employment, and thus not eligible for the non-hearsay definition. However, statements by managers of a defendant company purporting to relay other statements made by a plaintiff's supervisor, concerning matters within the scope of their employment, may avoid "double hearsay"classification because both levels of statements may be admissions of a party-opponent's agent or servant. *See, e.g.*, *El-Karanchawy v. AED Enters., LLC*, No. 4:09CV00442, 2010 U.S. Dist. LEXIS 76480, *13, n.3 (E.D. Mo. July 29, 2010).

As a branch manager, human resources matters concerning hiring and the company workforce are within the scope of Malhiwsky's employment. Kaman's argument that Malhiwsky was not responsible for decisions regarding *plaintiff's* employment is irrelevant because the test is whether the statements were made by management-level employees concerning matters within the scope of their employment — not plaintiff's. Malhiwsky's relating Caputo's statement to plaintiff was therefor an admission of a party-opponent and not hearsay.

### 2. Mark Kienstra's Testimony

Plaintiff sought to put on the testimony of Mark Kienstra, a sales professional in the power transmission industry, who had accompanied plaintiff on sales calls. Plaintiff disclosed Kienstra as a witness after the close of discovery, and, as a result, the Court ruled that Kienstra could not be offered as part of plaintiff's case in chief. Instead, Kienstra's testimony was offered on rebuttal.

Kaman appears to make two arguments with respect to Kienstra's testimony. First, Kaman contends that Kienstra's testimony was expert testimony, for which plaintiff failed to lay

17

a proper foundation.  Second, Kaman argues that Kienstra's testimony should have been excluded altogether as a result of plaintiff's late disclosure — and that Kienstra's testimony was not truly "rebuttal" testimony.

Federal Rule of Evidence 701 states that lay witnesses may testify to "opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge."  *See also Farner v. Paccar, Inc*, 562 F.2d 518, 528-29 (8th Cir. 1977).  Kienstra, according to plaintiff's memorandum, "opined about Plaintiff's ability to generate sales from certain customers based on his personal knowledge of these customer accounts through interactions he personally had with them – many, also in the company of Plaintiff, in order to generate sales."  Kaman fails to cite or quote the testimony to which it objects, but rather Kaman states that Kienstra testified as to the number of sales plaintiff "would or should have been able to generate from various customers."  Kaman asserts that the questions posed to Kienstra were on topics outside his personal knowledge and beyond the everyday experience of jurors — but that appears to be neither true for the former and not the applicable test for the latter.  Kienstra's testimony falls squarely into the parameters set by Rule 701:  his opinion was based on his perceptions from having worked along side plaintiff, his testimony was helpful to matters at issue in the case, and his testimony was not based on "scientific, technical, or specialized knowledge."

Kaman also apparently takes issue with the Court's decision to bar Kienstra from testifying as part of plaintiff's case in chief (which is what Kaman requested) and to allow Kienstra to testify as part of plaintiff's rebuttal (which apparently did not go as Kaman had planned).  Plaintiff initially identified Kienstra as a potential witness in his initial disclosures, but

plaintiff disclosed only that Kienstra's knowledge was limited to the role Higgins played after plaintiff was demoted. (Higgins was later dismissed as a defendant.) Then, in November 2010 (seven weeks after the close of discovery), plaintiff supplemented its disclosures to add that Kienstra was also knowledgeable about plaintiff's job performance (which Kaman says was an inadequate summary of Kienstra's testimony).

Kaman states that it made the decision not to depose Kienstra based on that disclosure. At the same time, Kaman suggests it was too late to take Kienstra's deposition. Aside from the contradiction inherent to Kaman's position, the Court notes that the parties were still taking depositions during that time; in fact, on January 18, 2011 — well after plaintiff filed his supplemental disclosure — plaintiff moved for continuance of the trial date and an extension of the discovery deadline in order to take certain depositions. (#72.) Kaman did not oppose the motion, and the motion was granted. (#73.) Kaman's decision not to depose Kienstra or to seek more information about Kienstra's knowledge is hardly plaintiff's fault. Notably, Kaman did not object to plaintiff's late supplementation of its Rule 26 disclosures until the eve of trial. Rather, it appears that Kaman now regrets its decision to insist on Kienstra's exclusion from Kaman's case in chief.

Kienstra's testimony was appropriate rebuttal testimony. He testified (as disclosed in November 2010) about plaintiff's performance. Kaman emphasized through testimony of its witnesses that it believed plaintiff's job performance was lacking. Kienstra's testimony about plaintiff's performance, and about the poor quality of the accounts Caputo assigned to plaintiff, was rebuttal testimony. Kaman may now be unhappy that Kienstra — the last witness to the take the stand — perhaps served to bolster plaintiff's testimony and damage the credibility of Kaman's witnesses, but the testimony was proper, Kienstra was available for cross-examination

19

on the witness stand, and Kaman's tactical decisions (whether Kaman regrets them now or not) were its own decisions to make.

At the same time, the Court does not agree that Kaman was prejudiced by Kienstra's testimony even if its inclusion was erroneous. Errors in evidentiary rulings are prejudicial only where the error likely affected the jury's verdict. *Diesel Machinery, Inc.*, 418 F.3d at 833. Here, although Kaman argues that Kienstra "propped up" plaintiff's case, the cumulative nature of the testimony was unlikely to have affected the jury's verdict on its own.

### IV. Conclusion

The jury's verdict and awards were reasonable and within the bounds of the law. Further, the Court did not err when it permitted plaintiff's wife to testify as to what she heard another Kaman employee say, nor when it permitted plaintiff to put on the testimony of Mark Kienstra as a rebuttal witness.

Accordingly,

**IT IS HEREBY ORDERED** that defendant's Renewed Motion for Judgment as a Matter of Law, for a New Trial, or to Reduce or Remit Damages, filed September 29, 2011 (#167), is **DENIED.**

Dated this __23rd__ day of November, 2011.

_____
UNITED STATES DISTRICT JUDGE